NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0199n.06

No. 22-1178

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED

Apr 26, 2023
DEBORAH S. HUNT, Clerk

ABRAHAM HUGHES,

    Plaintiff-Appellant,

v.

CITY OF WAYNE, MICHIGAN; WAYNE, MICHIGAN CITY COUNCIL; LISA NOCERINI; ALYSE LESLIE; JOHN RHAESA,

    Defendants-Appellees.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

OPINION

Before: MOORE, CLAY, and MATHIS, Circuit Judges.

**KAREN NELSON MOORE, Circuit Judge.** After being passed over for a promotion to chief of police, Abraham Hughes filed this lawsuit asserting claims under 42 U.S.C. § 1983 and Michigan state law. The district court dismissed Hughes's federal claims for failure to state a claim and declined to exercise supplemental jurisdiction over his state claims. We affirm.

## I. BACKGROUND

Hughes has worked as a police officer for the City of Wayne, Michigan, since 2002, and became a sergeant in 2016. R. 1 (Compl. ¶ 9) (Page ID #2). In 2018, Hughes learned that the chief of police planned to retire. *Id.* ¶ 10 (Page ID #2). Hughes began seeking a promotion to the position within the year.

In December 2018, Hughes met with City Manager Lisa Nocerini, Director of Personnel Alyse Leslie, and Mayor John Rhaesa to discuss the open police-chief position. *Id.* ¶¶ 2–4, 12

(Page ID #2–3).  Afterwards, Hughes, Nocerini, and Rhaesa met without Leslie.  *Id.* ¶ 13 (Page ID #3).  During this latter meeting, "Rhaesa and Nocerini expressed their extreme dissatisfaction with Former Chief Maciag and Acting Chief Strong[,] who[] Nocerini stated would not become the next Chief of Police[.]"  *Id.* (Page ID #3).  Nocerini explained that she was upset with Maciag and Strong because they had referred investigations of "incidents involving Wayne citizens and Wayne City employees" to Michigan state police rather than the City government.  *Id.* ¶ 14 (Page ID #3).

Later that month, a listing for the chief-of-police position was circulated within the police department.  *Id.* ¶ 15 (Page ID #3).  The listing stated that the next police chief would be selected based on a verbal interview and testing conducted by a private organization, Empco, Inc.  *Id.* (Page ID #3).[1]  Initially, Hughes, Strong, and one other candidate applied for the position.  *Id.* ¶ 16 (Page ID #3–4).  But the other candidate later withdrew, leaving only Hughes and Strong.  *Id.*

In February 2019, City police prepared an arrest warrant for Mark Blackwell, a frequent critic of Nocerini's job performance.  *Id.* ¶ 17–18 (Page ID #4).  According to Hughes, "[t]he warrant request was the result of personal intervention by Acting Chief Strong on behalf of a complaint by Nocerini."  *Id.* ¶ 18 (Page ID #4).  The warrant was issued in March 2019, and Blackwell was arraigned on unspecified charges later that month.  *Id.* ¶ 23–24 (Page ID #5).

While police were preparing Blackwell's warrant, Hughes and Strong met with Empco, "where they were informed that the sole qualification for the open Chief of Police position would

---

[1]Hughes refers to Empco as "EMPCO" throughout his complaint.  *See, e.g.*, R. 1 (Compl. ¶ 15) (Page ID #3). For ease of readability, and because Empco does not appear to capitalize its name in that way, *see About Us*, Empco Incorporated, https://www.empco.net/about/ (last visited Apr. 10, 2023), we refer to the organization simply as "Empco," including when quoting Hughes's complaint.

be the objective results—score and score only—of the Empco testing process." *Id.* ¶ 20 (Page ID #4). Hughes and Strong completed testing on March 7, 2019. *Id.* ¶¶ 16, 22 (Page ID #3–4).

On March 13, 2019, Nocerini and Hughes met to discuss the test results. *Id.* ¶ 25 (Page ID #5). Nocerini explained that Hughes had received a score of 87 and Strong had received a score of 90, and that she would promote Strong to chief of police. *Id.* ¶ 26 (Page ID #5). Hughes asked why he had not been interviewed, and Nocerini responded that "she had been conducting an interview for the last three months." *Id.* ¶ 28 (Page ID #5). But "Hughes did not interact with Nocerini on any regular basis in that three-month period while Acting Chief Strong did." *Id.* ¶ 29 (Page ID #5).

The following day, an unidentified "third-party" told Hughes "that one of the assessors who conducted the Empco testing confirmed that Hughes had received" a higher score than Strong, contradicting what Nocerini told Hughes at their meeting the day before. *Id.* ¶ 30 (Page ID #6). This revelation prompted Hughes to speak with someone named Chuck Castle at Empco, who told Hughes that during the Empco testing process "Nocerini contacted Empco to change the scoring requirements to include the relative strengths and weaknesses of each candidate." *Id.* ¶ 31 (Page ID #6). When Hughes and Castle spoke again in December 2020, Castle confirmed that Hughes had received a higher score than Strong during the Empco testing process, that Empco had reported that result to Nocerini within two-to-three days of testing, that the Empco scores were based solely on the testing conducted on March 7, 2019, and that Nocerini "had intervened in the normal Empco testing process to try to change the criteria used in scoring." *Id.* ¶ 33 (Page ID #6).

Hughes brought his concerns with the Empco testing process to Strong's attention in January 2021. *Id.* ¶ 34 (Page ID #6). "During that meeting," Strong explained that "he was clear

that it was going to be a score-and-score-only evaluation, but that [Empco] did not follow through." *Id.* ¶ 35 (Page ID #7). Strong also "confirmed . . . that [Empco] [was] only supposed to provide a numerical score, but that someone added plusses and minuses[.]" *Id.* The following month, Strong contacted Hughes and informed him that the City "would be conducting an investigation of improprieties surrounding the Chief selection process." *Id.* ¶ 36 (Page ID #7).

In March 2021, City Attorney Anthony Chubb contacted Hughes "to inform him of a pending investigation being conducted by [Chubb] and Leslie." *Id.* ¶ 37 (Page ID #7). Hughes met with Chubb and Leslie, but he objected that they had a conflict of interest in investigating Nocerini because he believed that the two were employed by and reported to Nocerini. *Id.* ¶ 39 (Page ID #7). Hughes was informed that the investigation would proceed "over his objections." *Id.* ¶ 40 (Page ID #7–8). In April 2021, the City Council was notified of the investigation, and one week later Hughes learned that the investigation had been completed and had not revealed any "wrongdoing" in the selection process. *Id.* ¶¶ 41–42 (Page ID #8).

Hughes filed a lawsuit in the District Court for the Eastern District of Michigan. R. 1 (Compl. at 1) (Page ID #1). He asserts claims under § 1983 and Michigan state law against the City and City Council, as well as Nocerini, Leslie, and Rhaesa in their individual and official capacities.[2] *Id.* ¶¶ 43–86 (Page ID #8–16). The defendants moved to dismiss Hughes's claims, arguing that he failed to state a plausible § 1983 claim and that his claims against Nocerini, Leslie, and Rhaesa in their personal capacities were barred by qualified immunity. R. 8 (Defs. Mot. to Dismiss at 7–15) (Page ID #57–65). The district court dismissed Hughes's § 1983 claims, declined

---

[2]Hughes has abandoned his official-capacity claims on appeal. Appellant Br. at 28–29.

to exercise supplemental jurisdiction over his state claims, and dismissed the state claims without prejudice. *Hughes v. City of Wayne*, No. 2:21-cv-11443, 2022 WL 433158, at *2–4 (E.D. Mich. Feb. 11, 2022). Hughes now appeals. R. 16 (Notice of Appeal at 2) (Page ID #345).

## II. ANALYSIS

We review de novo a district court's dismissal of a complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *Jackson v. Ford Motor Co.*, 842 F.3d 902, 906 (6th Cir. 2016). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## A. Federal Claims

Hughes asserts two § 1983 claims. His first claim alleges that the City maintained a custom, policy, or practice of allowing Nocerini to abuse her power by making appointment and promotion decisions "based upon her personal whims" rather than "objective criteria[.]" R. 1 (Compl. ¶ 49) (Page ID #9). His second claim alleges that the City, City Council, Nocerini, Leslie, and Rhaesa failed to train or supervise the City's "Management Team"—which, according to Hughes, comprises Nocerini, Leslie, and Rhaesa. *Id.* ¶¶ 59–66 (Page ID #11–12).

Although Hughes's § 1983 claims rest on different theories of liability and are brought against both municipal entities and individual defendants in their personal capacities, both claims require Hughes to plead a plausible "violation of a right secured by the Constitution and laws of the United States[.]" *West v. Atkins*, 487 U.S. 42, 48 (1988); *see Courtright v. City of Battle Creek*,

5

839 F.3d 513, 518 (6th Cir. 2016) (to overcome qualified immunity, a plaintiff must plead "that the defendant's conduct violated a constitutional right"); *North v. Cuyahoga County*, 754 F. App'x 380, 386 (6th Cir. 2018) (to establish municipal liability, a plaintiff must "demonstrat[e] an underlying constitutional violation"). Here, Hughes asserts that his procedural due-process rights under the Fourteenth Amendment were violated when he was not promoted to chief of police. R. 1 (Compl. ¶¶ 57–58, 66) (Page ID #10, 12). The district court found that Hughes failed to state a plausible procedural due-process violation. *Hughes*, 2022 WL 433158, at *2–4. We agree.

To establish a procedural due-process violation, Hughes must plausibly allege "(1) that [he has] a life, liberty, or property interest protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution, (2) that [he was] deprived of this protected interest within the meaning of the Due Process Clause, and (3) that the state did not afford [him] adequate procedural rights prior to depriving [him] of [his] protected interest." *Hahn v. Star Bank*, 190 F.3d 708, 716 (6th Cir. 1999). Because Hughes has not plausibly alleged that he had a property interest protected by the Due Process Clause, we do not address the remaining two elements.

Hughes argues that he had a "protected property interest in the promotion to chief of police[.]" Appellant Br. at 15. In *Board of Regents of State Colleges v. Roth*, the Supreme Court explained that "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." 408 U.S. 564, 577 (1972). Following *Roth*, we have "recognized that a party cannot possess a property interest in the receipt of a benefit when the state's decision to award or withhold the benefit is wholly discretionary." *Med Corp. v. City of Lima*, 296 F.3d 404, 409 (6th Cir. 2002). Taken together, these decisions dictate that a person

claiming a protected property interest in a discretionary government benefit "must point to some policy, law, or mutually explicit understanding that both confers the benefit and limits the discretion of the [the government] to rescind the benefit." *Med Corp.*, 296 F.3d at 410.

Two of our prior decisions illustrate the proper application of these principles. First, in *Med Corp.*, an ambulance provider—Med Corp.—alleged that it had been denied procedural due process when a city government stopped sending it 911 calls. 296 F.3d at 407–08. We began our evaluation of Med Corp.'s claim by considering whether there was a "written policy or legislative enactment establish[ing] a procedure for maintenance of the 911 dispatch list or limit[ing] the discretion of [c]ity officials to remove ambulance companies from the list." *Id.* at 410. Upon finding that no such written enactment existed, we noted that "property interests may be created in some situations despite the absence of explicit contractual or legal provisions establishing a claim of entitlement" and asked whether there was evidence of "an implicit, but nonetheless legally binding, obligation to continue to include Med Corp. in the [c]ity's allocation of 911 dispatches." *Id.* at 411 (citing *Perry v. Sindermann*, 408 U.S. 593, 601–02 (1972)). Because there was no evidence of an implicit obligation, we rejected Med Corp's due-process claim. *Id.*

Similarly, in *Golden v. Town of Collierville*, Golden asserted that his procedural due-process rights were violated when he was not promoted to a lieutenant position in his city's fire department. 167 F. App'x 474, 477–78 (6th Cir. 2006). Golden based his claim on a conversation he had with the fire chief, who told Golden that he would be promoted to lieutenant the following month. *Id.* at 475. After a member of the fire department learned of the chief's decision and complained, the chief reversed course and denied Golden the promotion. *Id.* at 476–77. We observed that "even if we were persuaded that his conversation with [the fire chief] effectively

conferred the benefit of the promotion, Golden has not provided any evidence that the terms of that conversation limited the defendants' discretion to rescind the promotion." *Id.* at 478. As a result, we held that "[t]he defendants' discretion to rescind a proposed promotion is not limited to the extent that *Med Corp* requires in order for a property interest to be created." *Id.* at 478–79.

Although *Med Corp.* and *Golden* were decided at the summary-judgment stage, we find their reasoning persuasive here. Like the plaintiffs in those cases, Hughes challenges a discretionary decision. Indeed, there is no dispute that the City Charter provides that the chief of police "shall be appointed by the City Manager for [an] indefinite term[] of office, subject to confirmation by the Council."[3] R. 8-5 (Defs. Mot. to Dismiss, Ex. 4 at § 6.8(b)) (Page ID #105). Thus, Nocerini had the discretion to appoint the police chief, subject only to the City Council's confirmation. To plead a plausible due-process violation, therefore, Hughes "must point to some policy, law, or mutually explicit understanding that both confers the benefit and limits the discretion of [Nocerini] to rescind the benefit." *Med Corp.*, 296 F.3d at 410.

Hughes does not allege a "written policy or legislative enactment" that entitled him to the promotion or that limited Nocerini's discretion over the appointment process or decision. *Id.* at 410. Instead, he argues that Nocerini and the City entered into an implied contract to promote the candidate with the highest Empco score to police chief. In *Med Corp.*, we said that Med Corp.

---

[3]Hughes did not reference or attach the City Charter in his complaint. "Although typically courts are limited to the pleadings when faced with a motion under Rule 12(b)(6)," *Buck v. Thomas M. Cooley L. Sch.*, 597 F.3d 812, 816 (6th Cir. 2010), "courts . . . can take judicial notice of, for example, administrative rules, regulations, and orders, and certain judicial and public records[,]" *Davis v. Colerain Township*, 51 F.4th 164, 176 (6th Cir. 2022). Hughes does not challenge our ability to consider the City Charter, and we therefore conclude that we may properly consider it here. *See Jackson v. City & County of Denver*, No. 20-1051, 2022 WL 120986, at *1 n.1 (10th Cir. Jan. 13, 2022) (taking judicial notice of the Denver City Charter); *Demos v. City of Indianapolis*, 302 F.3d 698, 706 (7th Cir. 2002) (recognizing federal courts' power to take judicial notice of city charters and other public records).

"could establish a protected property interest if it could show that *the [m]ayor or the [c]ity* engaged in words or conduct that created an implicit, but nonetheless legally binding, obligation to continue to include Med Corp. in the [c]ity's allocation of 911 dispatches." *Id.* at 411 (emphasis added). We thus assume that Hughes could similarly demonstrate a protected property interest in being promoted to police chief if Nocerini or the City had engaged in words or conduct that created a legally binding obligation to promote the candidate with the highest Empco test score.[4]

Hughes alleges that several third parties stated that the candidate with the highest Empco score would be promoted to chief of police, but he does not link any of those statements to Nocerini or the City. For instance, he alleges that an unidentified Empco employee told him that "the sole qualification for the open Chief of Police position would be the objective results—score and score only—of the Empco testing process." R. 1 (Compl. ¶ 20) (Page ID #4). Although Empco had been retained by the City to conduct the testing process, Hughes does not allege that the company had any control over Nocerini's promotion decision or that the employee's statement was based on something Nocerini or the City had said or done. Similarly, Hughes's allegation that Strong stated, after he had already been promoted to chief of police, "that he was clear that it was going to be a score-and-score only evaluation" does not source Strong's belief to Nocerini's or the City's words or actions, nor does it evidence an agreement to base the promotion decision solely on the Empco test scores.[5] *Id.* ¶ 35 (Page ID #7). *Cf. Golden*, 167 F. App'x at 478 (assuming without

---

[4]The defendants argue that only Nocerini could limit her own discretion to appoint the chief of police. *See* Appellees Br. at 21–22. Because Hughes has not plausibly alleged that either Nocerini or the City agreed to limit Nocerini's appointment authority, we do not address any issues regarding the City's power to impose limits on her authority.

[5]In any event, Strong's purported statement—which he is alleged to have made after Hughes asked him "if he . . . remembered what Empco said they were going to provide to the City of Wayne"—suggests that Strong believed

deciding that the fire chief's conversation, which occurred prior to the ultimate promotion decision, "effectively conferred the benefit of the promotion" to Golden). Hughes has thus not plausibly alleged that Nocerini or the City "engaged in words or conduct" evidencing an implicit but binding agreement to circumscribe Nocerini's discretion to appoint the police chief. *Med Corp.*, 296 F.3d at 411.

In fact, the alleged words and conduct that Hughes does source directly to Nocerini and the City undermine his claim that there was an agreement to limit Nocerini's discretion over the promotion decision. He alleges, for example, that the listing for the police-chief position that was circulated within the police department stated that the qualification process would include *both* an interview *and* testing conducted by Empco. R. 1 (Compl. ¶ 15) (Page ID #3). True, Hughes alleges that he was never interviewed in connection with his application. *Id.* ¶¶ 19, 28 (Page ID #4–5). But he does not allege that Nocerini or the City agreed to eliminate the interview requirement. To the contrary, Hughes alleges that when he inquired about the lack of an interview, Nocerini responded "that she had been conducting an interview for the last three months." *Id.* ¶ 28 (Page ID #5). Hughes does not allege that Nocerini stated that the interview requirement had been dispensed with or that she would make her promotion decision based on the Empco scores alone.

In sum, Hughes has not plausibly alleged a "policy, law, or mutually explicit understanding that" the candidate with the highest Empco test score would be promoted to chief of police. *Med Corp.*, 296 F.3d at 410. Accordingly, Hughes has alleged only a "unilateral expectation" that is not entitled to constitutional protection under the Due Process Clause. *Roth*, 408 U.S. at 577.

---

that Empco would provide the City with "a score-and-score-only evaluation," not that Nocerini would make her decision based on that evaluation alone. R. 1 (Compl. ¶ 35) (Page ID #7).

Hughes makes two arguments in response. First, he argues that his case is controlled by *Paskvan v. City of Cleveland Civil Service Commission*, 946 F.2d 1233 (6th Cir. 1991). We disagree. In *Paskvan*, a police officer was denied a promotion despite ranking third on the eligibility list. *Id.* at 1234. The officer alleged "that it was the policy of Cleveland to promote from the eligibility list in the order of rank" and that "all the top 18 candidates eligible for promotion, except Paskvan, were granted promotion." *Id.* We held that the officer had "at least arguably and sufficiently alleged defendants' course of conduct," despite their discretion over promotion decisions, "create[d] an implied contract or mutually explicit understanding for promotion based on test scores[.]" *Id.* at 1237. Here, by contrast, Hughes has not alleged that Nocerini or the City previously or consistently made promotion decisions based on only test scores. Thus, the crucial fact that allowed Paskvan to survive a motion to dismiss—that the city had acted in a way that suggested the existence of an implied contract—is missing here.

Second, Hughes argues that an affidavit from a former member of the City Council "demonstrates" that Nocerini agreed to limit her discretion to appoint the police chief. Appellant Br. at 16; *see* R. 9-7 (Aff. of Anthony W. Miller at 1–3) (Page ID #242–44). Hughes concedes, however, that this affidavit was introduced with his opposition to the defendants' motion to dismiss. Appellant Br. at 16. Because Hughes does not argue that the affidavit or its contents were incorporated by reference in or integral to his complaint, and the affidavit is not an appropriate subject of judicial notice, we decline to consider it. *See Luis v. Zang*, 833 F.3d 619, 626 (6th Cir. 2016).

Hughes has not plausibly alleged a protected property interest in being promoted to chief of police. We therefore affirm the dismissal of his § 1983 claims.

11

## B. State Claims

Hughes also asserts claims under Michigan law. After finding that Hughes had not stated a plausible federal claim, the district court declined to exercise jurisdiction over his state claims and dismissed the claims without prejudice. *Hughes*, 2022 WL 433158, at \*4. Hughes does not challenge this aspect of the district court's decision, and, in any event, the district court did not abuse its discretion. *See Widgren v. Maple Grove Township*, 429 F.3d 575, 586 (6th Cir. 2005).

### III. CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court.