RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 05a0445p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————————

KENNETH D. WIDGREN, JR. and KENNETH D. WIDGREN, SR.,

*Plaintiffs-Appellants,*

*v.*

MAPLE GROVE TOWNSHIP; H. WAYNE BELDO; LOUIS LENZ, JR.,

*Defendants-Appellees.*

> No. 04-2189

————————————

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 04-00098—Richard A. Enslen, District Judge.

Submitted: November 10, 2005

Decided and Filed: November 17, 2005

Before: MERRITT, MOORE, and SUTTON, Circuit Judges.

————————————

## COUNSEL

**ON BRIEF:** William L. Henn, SMITH, HAUGHEY, RICE & ROEGGE, Grand Rapids, Michigan, for Appellees. Kenneth D. Widgren, Jr., Warren, Michigan, Kenneth D. Widgren, Sr., Hazel Park, Michigan, pro se.

————————————

## OPINION

————————————

MERRITT, Circuit Judge. This case presents the question whether certain housing code and property tax inspections of the exterior of a house within the "curtilage" in a remote rural setting constitute a "search" within the meaning of the Fourth Amendment. Balancing a number of factors regarding the Widgrens' reasonable expectation of privacy, we hold that the intrusions at issue are not Fourth Amendment searches, and we affirm the District Court's judgment in favor of the defendants on the parties' cross-motions for summary judgment.

1

# I. Factual Background

Plaintiff Kenneth Widgren, Sr., solely owns twenty acres of largely undeveloped land in Maple Grove Township, Michigan.[1]  Densely populated trees, hills and thick overgrowth cover much of the grounds.  In May or June of 2002, Mr. Widgren, Sr., began construction of a house in the middle of his rectangularly shaped lot and weather-sealed the structure later that year.  By the spring of 2003, the area immediately surrounding the house was cleared, routinely mowed and a clear line marked the perimeter of the mowed portion.  The cleared area, which was not enclosed by a fence, contained a fire pit, pruned trees and a picnic table, but no other noticeable landscaping or improvements.

Over one thousand feet of dirt driveway wind through "swampy and thick" terrain, a row of pine trees and a rye field, and connect the house to Puustinen Road, the sole public access to the Widgren property.  At the mouth of the driveway stands a metal gate, twenty feet long by three feet high, that displays multiple "No Trespassing" signs, one of which warns "federal officers of the IRS, HEW, HUD, environmental, health, and other unconstitutional agencies" as well as "all local members of planning & zoning boards" of a $5,000 per person land use fee.  The house, which also stores various personal belongings of the son of Mr. Widgren, Sr., co-plaintiff Kenneth Widgren, Jr., can be plainly seen only from two vantage points outside the property - from the adjoining parcel to the south and from the air.

The Widgrens did not obtain a building permit for the construction of the house.  In the spring of 2003, defendants Louis Lenz, Jr., the zoning administrator of Maple Grove Township, and H. Wayne Beldo, the Township tax assessor, entered the property a total of three times to confirm the zoning violation, to post a civil infraction on the front door of the house, and to conduct a tax assessment through observation of the exterior of the house.  Once the Widgrens learned of the three visits, each of which is discussed below in more detail, the father and son brought suit in the U.S. District Court for the Western District of Michigan, alleging various violations of federal and state law.  Both the Widgrens and the defendants moved for partial summary judgment on the Fourth Amendment claims filed pursuant to 42 U.S.C. § 1983.  Relying on the "open fields" doctrine, the District Court granted the defendants' motion and held that no Fourth Amendment violation occurred.  The District Court then denied the Widgrens' motion, and, with only state law claims remaining, dismissed the state law claims without prejudice pursuant to 28 U.S.C. § 1367(c)(3).

## II. Analysis

### A. Applicable General Principles

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, *against unreasonable searches* and seizures, shall not be violated, and [that] no Warrants shall issue, but upon probable cause . . . ."  U.S. Const. amend. IV (emphasis added).  The Fourth Amendment's protections hinge on the occurrence of a "search," a legal term of art whose history is riddled with complexity.  *See Kyllo v. United States*, 533 U.S. 27, 32 (2001) (discussing "when a search is not a search").  A search is defined in terms of a person's "reasonable expectation of privacy" and is analyzed under a two-part test first penned in *Katz v. United States*, 389 U.S. 347 (1967): (1) "has the individual manifested a subjective expectation of privacy in the object of the challenged search?" and (2) "is society willing to recognize that expectation as reasonable?"  *California v. Ciraolo*, 476 U.S. 207, 211 (1986).

---

[1] The facts set forth below are taken in the light most favorable to the plaintiffs.  *See* Fed. R. Civ. P. 56(c).

The second prong of the *Katz* test generally addresses two considerations. The first focuses on "what a person had an expectation of privacy *in*, for example, a home, office, phone booth or airplane." *Dow Chemical Co. v. United States*, 749 F.2d 307, 312 (6th Cir. 1984), *aff'd*, 476 U.S. 227 (1986) (emphasis in original); *see also Oliver v. United States*, 466 U.S. 170, 178 (1984) (noting "our societal understanding that certain areas deserve the most scrupulous protection from government invasion"); *United States v. White*, 401 U.S. 745, 786 (1971) (Harlan, J., dissenting) (assessing "the individual's sense of security"); Wayne R. LaFave, 1 *Search and Seizure: A Treatise on the Fourth Amendment* § 2.1(d) (4th ed. 2004). This inquiry centers on "whether the human relationships that normally exist at the place inspected are based on intimacy, confidentiality, trust or solitude and hence give rise to a 'reasonable' expectation of privacy." *Dow Chemical Co.*, 749 F.2d at 312.

The second consideration examines "what the person wanted to protect his privacy *from*, for example, non-family members, non-employees of a firm, strangers passing by on the street or flying overhead in airplanes." *Id.* (emphasis in original); *see also Oliver*, 466 U.S. at 178 (discussing "government invasion" and "arbitrary government interference"); *White*, 401 U.S. at 762 (asking whether, in a particular situation, "self-restraint by law enforcement officials [is] an inadequate protection"); *cf. Kyllo*, 533 U.S. at 34 (addressing the limits of the "power of technology to shrink the realm of guaranteed privacy"); *Olmstead v. United States*, 277 U.S. 438, 474 (1928) (Brandeis, J., dissenting) (warning of "[t]he progress of science in furnishing the government with means of espionage"). This inquiry, therefore, focuses on the government intrusion at issue.

Other relevant factors in applying *Katz*'s second prong include "the intention of the Framers of the Fourth Amendment" and "the uses to which the individual has put a location." *Oliver*, 466 U.S. at 178.

While applying these considerations to *Katz*' second prong to determine whether "society [is] willing to recognize that expectation as reasonable," the Supreme Court has drawn some bright line rules concerning the home, the curtilage, and open fields. These three doctrines converge in this case and are all discussed below.

## B. Application of Principles

The Widgrens claim that the defendants conducted three separate searches in violation of the Fourth Amendment. We address each instance individually.

### 1. The Initial Inspection

While driving on Sedlar Road in late March of 2003, Mr. Lenz, the Township's zoning administrator, apparently observed a reflection from the roof or window of the Widgrens' house. Unsure what he had seen but confident that no land use permit had been issued for a house there, Mr. Lenz parked on Puustinen Road and advanced up the Widgrens' driveway past the metal gate and "No Trespassing" signs until he came within 200 feet of the house, which, for the first time, was clearly visible. Not having entered the cleared area , Mr. Lenz returned to the Township offices to confirm that no land use permit had been issued for the Widgren property. He then promptly informed Mr. Widgren, Sr., by letter of the violation of the Township's zoning ordinance.

Mr. Lenz' observations here, occurring in the open fields, did not constitute a Fourth Amendment search. No reasonable expectation of privacy exists in "open fields." *Oliver*, 466 U.S. at 177. The term "open fields" is somewhat of a misnomer in that "[a]n open field need be neither 'open' nor a 'field'" and "may include any unoccupied or undeveloped area outside of the curtilage." *Id.* at 180 n.11. "[T]here is no constitutional difference between police observations conducted while in a public place and while standing in the open fields." *United States v. Dunn*, 480 U.S. 294, 304 (1987). Moreover, "[i]n the case of open fields, the general rights of property protected by the

common law of trespass have little or no relevance to the applicability of the Fourth Amendment." *Oliver*, 466 U.S. at 183-84.   The presence of "No Trespassing" signs, furthermore, does not transform the open fields into an area where an expectation of privacy is necessarily reasonable. *See id.* at 179, 183 n.13.

In *Dunn*, relying on the open fields doctrine, the Supreme Court declined to equate much more intrusive government conduct than that involved here with a Fourth Amendment violation:

> It follows that no constitutional violation occurred here when the officers crossed over respondent's ranch-style perimeter fence, and over several similarly constructed interior fences, prior to stopping at the locked front gate of the barn . . . [T]he officers never entered the barn, nor did they enter any other structure on respondent's premises.  Once at their vantage point, they merely stood, outside the curtilage of the house and in the open fields upon which the barn was constructed, and peered into the barn's open front.  And, standing as they were in the open fields, the Constitution did not forbid them to observe the phenylacetone laboratory located in respondent's barn . . . Here, the officers' use of the beam of a flashlight, directed through the essentially open front of respondent's barn, did not transform their observations into an unreasonable search within the meaning of the Fourth Amendment.

*Dunn*, 480 U.S. at 304-05.  Accordingly, Mr. Lenz' conduct in his initial visit to the Widgren property, while perhaps a trespass, was not a search under the Fourth Amendment.

### 2. The Second Inspection

Mr. Lenz revisited the Widgren property several weeks later, on April 17, 2003, to post a civil infraction on the front door of the house.[2]  This intrusion was not a Fourth Amendment search because, under any definition, no search of any kind occurred.  A search generally implies looking "over or through for the purpose of finding something." *Kyllo*, 533 U.S. at 33 n.1 (quoting Noah Webster, *An American Dictionary of the English Language* 66 (6th ed.1989) (1828)).  According to one court, a search may occur even where the officer was not intentionally looking for something, so long as "the objective effect of his actions" infringed a reasonable expectation of privacy. *United States v. Maple*, 348 F.3d 260, 263 (D.C. Cir. 2003) (quoting *Bond v. United States*, 529 U.S. 334, 338 n.2 (2000)).

In *Artes-Roy v. City of Aspen*, 31 F.3d 958 (10th Cir. 1994), the Tenth Circuit addressed a situation similar to the case at bar and found no Fourth Amendment violation.  The plaintiff in that case obtained a building permit for home renovations but subsequently failed to comply with related documentation requirements.  The building inspector then issued a stop work order.  After noting ongoing construction at the site, the inspector informed the plaintiff that all work had to stop.  When his directions went unheeded, he and his supervisor entered the plaintiff's home to notify the workers of the stop work order.  The plaintiff brought an action pursuant to 42 U.S.C. § 1983 alleging that the defendants' actions violated the Fourth Amendment.  The Tenth Circuit rejected the plaintiff's claim:

> [T]here does not appear to be any search or seizure, thus no violation of the Fourth Amendment.  For purposes of this appeal we assume Lyman himself pushed open the door to the premises and stepped into the entryway without any proper consent.

---

[2] On that visit, Mr. Lenz also brought the state building inspector, who is not a party to this action, to show him the house's location.  The record is too undeveloped on the nature and activities of the state inspector on the property for us to address whether Mr. Lenz's act of leading the state inspector to the Widgren property implicates the Fourth Amendment.

Lyman was not on the premises to inspect for a violation of the building code; he and the inspector had already seen what they considered violations of the stop work order, from outside the premises. It seems clear Lyman did not intend to make any arrest on the premises . . . To issue a citation, of course, is not to make an arrest . . . . Thus, Lyman did not enter plaintiff's home for either a search or a seizure . . . Lyman had a right to approach plaintiff's home to talk to her when he observed from the street workers violating the stop work order . . . Lyman's intrusion was minimal, even if he was more than one foot inside the entryway. It is clear he was not there to inspect or to take into physical custody any person or property. In these circumstances, we hold there was no Fourth Amendment violation.

*Artes-Roy*, 31 F.3d at 962 (internal citations omitted).

In the instant situation as in *Artes-Roy*, objectively speaking, nothing was looked for and nothing was found, except the existence of a structure. Mr. Lenz merely posted a citation in his capacity as the Township's zoning administrator and did not seek to discover incriminating evidence. Moreover, the intrusion here was even more minimal than in *Artes-Roy* because Mr. Lenz never set foot in the house. In his second visit to the Widgren property, Mr. Lenz, therefore, did not conduct a Fourth Amendment search.

### 3. The "Curtilage" Inspection

The intrusion of Mr. Beldo, the Township's assessor, presents a more difficult question. Around the time of Mr. Lenz' initial visit, he told Mr. Beldo about the house. Mr. Beldo examined Township records to confirm the lack of a land use permit and may have reviewed an aerial photograph that appeared to depict the house. Mr. Beldo then drove along Puustinen Road to the Widgren property. Upon reading the "No Trespassing" signs, he drove onto the neighboring property to the south and exited his truck. While still on the neighboring property, he observed the Widgren house. He then walked onto the Widgren property towards the plainly visible house where no one appeared to be home. He observed the house's exterior, measured it by counting the foundation cement blocks, and took a photograph of the house. While ascertaining its dimensions, Mr. Beldo entered the cleared area but came no closer than four to six feet from the house and did not look into or enter the house. After conducting his assessment, he promptly left and sent Mr. Widgren, Sr., a letter informing him of the assessment.

Pursuant to our above discussion of *Dunn* and the initial visit of Mr. Lenz, Mr. Beldo's naked-eye observations of the house's exterior from the neighboring property and from the open fields within the Widgren property for tax assessment purposes are not Fourth Amendment searches. A closer question, however, is whether Mr. Beldo's observation of the house that occurred within the cleared area constitute a Fourth Amendment search. The parties dispute whether any curtilage existed around the house, and, accordingly, whether Mr. Beldo entered curtilage. The Widgrens point to the modest improvements to the land surrounding the house, while the defendants claim that the cleared area is simply too undeveloped to constitute curtilage.

In *United States v. Dunn*, 480 U.S. 294 (1987), the Supreme Court described the contours of the Fourth Amendment's protections in "curtilage," the area immediately surrounding a home that "harbors the 'intimate activity associated with the 'sanctity of a man's home and the privacies of life.'" *Dunn*, 480 U.S. at 300 (quoting *Oliver*, 466 U.S. at 180). The *Dunn* court established four factors for determining whether an area is a home's curtilage:

[1] the proximity of the area claimed to be curtilage to the home, [2] whether the area is included within an enclosure surrounding the home, [3] the nature of the uses to

which the area is put, and [4] the steps taken by the resident to protect the area from observation by people passing by.

*Id.* at 301.

Applying these factors to the facts taken in the light most favorable to the plaintiffs, we conclude that the cleared area immediately surrounding the house constituted curtilage. First, the area at issue here lay within immediate proximity to the house, only four to six feet away, unlike the area in *Dunn* that was located sixty yards from the house. Second, although the area was not within an enclosure, a clear line marked the mowed portion from the surrounding area that had not been cleared. Third, the cleared area had apparently been used for "the activities and privacies of domestic life" manifested by the presence of a picnic table, a fire pit, and pruned trees. *See Dunn*, 480 U.S. at 303. Fourth, the Widgrens maintained a metal gate and "No Trespassing" signs to protect the area from observation by people passing by; although these measures may not have been enough in a more urban environment, errecting a fence likely would have added little privacy in this remote rural location.

Our analysis does not end with a finding of curtilage. The Supreme Court has concluded that the Fourth Amendment does not absolutely bar all government encroachment upon the curtilage:

> That the area is within the curtilage does not itself bar all police observation. The Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares. Nor does the mere fact that an individual has taken measures to restrict some views of his activities preclude an officer's observations from a public vantage point where he has a right to be and which renders the activities clearly visible.

*California v. Ciraolo*, 476 U.S. 207, 213 (1986).

In addition, as noted above, a Fourth Amendment search occurs only where a reasonable expectation of privacy exists under *Katz*'s two part test. First, we assume without deciding that the Widgrens had a subjective expectation of privacy in the naked-eye observation of their house's exterior from within the curtilage for tax assessment purposes. Second, we now address whether this expectation was one society recognizes as reasonable. To do so, we examine both what Justice Harlan called the "individual's sense of security," *United States v. White*, 401 U.S. 745, 786 (1971) (Harlan, J., dissenting), and the government intrusion at issue.

Here, the sense of security or "what a person had an expectation of privacy *in*," *Dow Chemical Co.*, 749 F.2d at 312, was, in the words of the defendants, "the plainly visible attributes and dimensions of the exterior of their home." "At the very core [of the Fourth Amendment] stands the right of a man to retreat *into* his own home and there be free from unreasonable governmental intrusion." *Silverman v. United States*, 365 U.S. 505, 511 (1961), *quoted in Kyllo v. United States*, 533 U.S. 27, 31 (2001) (emphasis added). On the other hand, "the lawfulness of warrantless visual surveillance of a home has still been preserved," and "visual observation is no 'search' at all." *Kyllo*, 533 U.S. at 32. In short, "the Fourth Amendment has drawn a firm line at the entrance to the house" so that, "[a]bsent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Payton v. New York*, 445 U.S. 573, 590 (1980). This "distinction of constitutional magnitude" between a house's interior and exterior is firmly rooted in the text of the Fourth Amendment, "which guarantees the right of people 'to be secure *in* their . . . houses' against unreasonable searches and seizures." *Kyllo*, 533 U.S. at 41, 43 (Stevens, J., dissenting) (emphasis in original) (distinguishing between "off-the-wall" and "through-the-wall" surveillance); *see also United States v. United States Dist. Court*, 407 U.S. 297, 313 (1972) (noting that the "physical entry

of the home is the chief evil against which the wording of the Fourth Amendment is directed"). In the instant case, the Widgren house was plainly visible from a neighboring property and from the air. Accordingly, their expectation of privacy in "the plainly visible attributes and dimensions of the exterior of their home" is at the Fourth Amendment's periphery, not its core, when compared to the hidden features of the house's interior.

Next, we examine the challenged government intrusion or "what the person wanted to protect his privacy *from*." *Dow Chemical Co.*, 749 F.2d at 312. The purported Fourth Amendment violation was Mr. Beldo's naked-eye observations and surveying of the house's exterior from within the curtilage for tax assessment purposes. Assessing the degree of intrusion requires addressing both the methods used and the purpose for the intrusion. Police methods range from "ordinary visual surveillance" to "technological enhancement of ordinary perception" through devices not in general public use. *Kyllo*, 533 U.S. at 31, 33, 40. Extraordinary measures requiring an officer "to crane his neck, or bend over, or squat" are generally more intrusive than those a "reasonably curious neighbor" might undertake. *See James v. United States*, 418 F.2d 1150, 1151 n.1 (D.C. Cir. 1969); Wayne R. LaFave, 1 *Search and Seizure: A Treatise on the Fourth Amendment* § 2.3(g) (4th ed. 2004). Likewise, those tactics littered with "dirty business" such as trickery and illegal acts can accompany an unjustifiable government intrusion. *See Olmstead v. United States*, 277 U.S. 438, 470 (1928) (Holmes, J., dissenting). Breaching the curtilage and other trespass, though not necessarily determinative, are also relevant to the degree of government intrusion. *See Oliver v. United States*, 466 U.S. 170, 183 (1984); *Fullbright v. United States*, 392 F.2d 432, 434 (10th Cir. 1968).

Like the methods used, the purpose for the interference bears upon the intrusiveness of government action. A criminal investigation is generally more intrusive than an administrative or regulatory investigation:

> [T]he search involved [in administrative inspections] is less of an intrusion on personal privacy and dignity than that which generally occurs in the course of criminal investigation. This is a real and meaningful distinction. The concern of the inspector is directed toward such facilities as the plumbing, heating, ventilation, gas, and electrical systems, and toward the possible accumulation of garbage and debris. These matters may be looked into in a much shorter period of time than it often takes to search for evidence of crime, and certainly no rummaging through the private papers and effects of the householder is required. Nothing is seized. A police search for evidence brings with it "damage to reputation resulting from an overt manifestation of official suspicion of crime." A routine inspection that is part of a periodic or area inspection plan does not single out any one person as the object of official suspicion. The search in a criminal investigation is made by armed officers, whose presence may lead to violence, and is perceived by the public as more offensive than that of the inspector. Police searches are conducted at all times of the day and night, while routine inspections are conducted during regular business hours. By their very nature and purpose, police searches usually must be conducted by surprise. In contrast, some inspection programs involve advance notice that the inspector will call on a certain date, and an inspector on his rounds will sometimes agree to return at a more convenient time if the householder so requests. This permits the owner or occupant to remove or conceal anything that might be embarrassing to him.

Wayne R. LaFave, 5 *Search and Seizure: A Treatise on the Fourth Amendment* § 10.1(b) (4th ed. 2004). This reasoning bolsters the relaxed probable cause requirement for safety inspections of the

interior of residences and commercial structures. *See generally Camara v. Mun. Court of the City & County of San Francisco*, 387 U.S. 523 (1967); *See v. City of Seattle*, 387 U.S. 541 (1967).[3]

In *State v. Vonhof*, 751 P.2d 1221 (Wash. Ct. App. 1988), the Court of Appeals of Washington state held that no Fourth Amendment search occurred when a tax appraiser entered the defendants' property, but not their residence, for tax purposes. To reach the defendants' residence, the appraiser passed through two gates and passed by several "No Trespassing" signs. He knocked on the door, took photographs of the house, measured the dimensions of a new porch addition, and knocked on the side of a shop building on the premises to determine if the structure was insulated. While conducting his appraisal, he smelled the odor of marijuana and then relayed that information to the sheriff. The *Vonhof* court held that the appraiser's visit was not a Fourth Amendment search based on various factors:

> (1) He did not spy into the residence, and never entered either building; (2) his route was a normal one, considering his purpose of inspecting the new structure; (3) he acted openly and honestly, by knocking at the residence and yelling outside the shop building; (4) he apparently got very close to the shop, but no closer than necessary to conduct his inspection, and he did not enter the shop's open doors; (5) his discovery was accidental; (6) he did not create an artificial vantage point to smell the growing marijuana; (7) his inspection occurred in the daytime; and (8) he went only where he needed to go to conduct his inspection.

*Vonhof*, 751 P.2d at 1225.

Similarly, other cases have upheld the constitutionality of visits by building inspectors, even though the inspectors entered the house without the owner's consent. The aforementioned *Artes-Roy v. City of Aspen*, 31 F.3d 958 (10th Cir. 1994), determined that a building inspector does not violate the Fourth Amendment by entering a residence in a minimal way solely for the purpose of enforcing a stop work order. In an unreported decision, a Michigan district court reached a similar conclusion. *Yarbro v. Shamblin*, No. 4:02-CV-170, 2002 U.S. Dist. LEXIS 18583 (W.D. Mich. Sept. 23, 2002).

Other courts have declined to find Fourth Amendment violations where government agents merely inspected a structure's exterior attributes or emissions, even when those inspections occurred within the property of the objecting party. *See Ehlers v. Bogue*, 626 F.2d 1314, 1315 (5th Cir. 1980) (per curiam) (finding no Fourth Amendment violation where health inspectors surveyed the outside of the plaintiff's apartment building while on the plaintiff's property); *Air Pollution Variance Bd. of the State of Colorado v. W. Alfalfa Corp.*, 416 U.S. 861, 864-65 (1974) (holding that no Fourth Amendment violation occurred where a state health inspector entered a corporation's property and inspected plumes of smoke emitted from the corporation's plant).

Applying these principles to the instant case, Mr. Beldo's actions were not unduly intrusive. He used naked-eye observations unaided by technological enhancements. His methods were not extraordinary in that, for example, he was not forced to contort his body unnaturally to survey the house, but instead merely counted the foundation cement blocks in plain view. No "dirty business" was transacted, and his observations occurred during the daytime. He did not touch, enter, or look into the house. Nor did he stray beyond areas reasonably necessary to aid his inspection. The most unsettling intrusion of Mr. Beldo, however, was his entry into the curtilage. Tax appraisers would be well advised to obtain consent or a warrant as a matter of course before breaching the curtilage because, in many instances, such an intrusion may be a Fourth Amendment search. Yet the Fourth Amendment cannot be stretched to bar categorically all government breaches of the curtilage. *See*

---

[3]*Camara*, *See* and their progeny addressing administrative warrants are distinguishable from the instant case in that they presume an entry of a structure, not the naked-eye observations of the structure's exterior.

*Estate of Smith v. Marasco*, 318 F.3d 497, 521 (3d Cir. 2003) ("[T]here remain questions of fact as to whether the officers' intrusion into the curtilage was reasonable in light of their asserted purpose in making their entry into [the] property which was not to make a search."); *United States v. Raines*, 243 F.3d 419, 422 (8th Cir. 2001) ("[A deputy] did not violate the Fourth Amendment by proceeding into [the resident's] backyard in the good faith attempt to serve civil process."). Such invasions implicate the law of trespass, but not necessarily the Fourth Amendment. *See Oliver v. United States*, 466 U.S. 170, 183-84 (1984) (distinguishing the Fourth Amendment and the law of trespass). We also find it highly significant that the purpose of government intrusion here was an administrative, not criminal, inspection.

We, therefore, hold that, under the facts of this case, a property assessor does not conduct a Fourth Amendment search by entering the curtilage for the tax purpose of naked-eye observations of the house's plainly visible exterior attributes and dimensions - all without touching, entering or looking into the house.

### III. Miscellaneous Issues

Several other matters remain to be addressed. Having held that no Fourth Amendment search occurred, we have no further occasion to decide whether Mr. Widgren, Jr., had "standing" to raise a Fourth Amendment claim. *See Minnesota v. Carter*, 525 U.S. 83, 88 (1998) (quoting *Rakas v. Illinois*, 439 U.S. 128, 140 (1978)) (The "definition of [Fourth Amendment] rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing."). We also decline to reach the merits of the availability of qualified immunity.

Since no federal claims remain, we must decide whether the District Court abused its discretion in declining to exercise supplemental jurisdiction over the remaining state law claims, such as trespass and breach of implied contract. District courts have discretion to refuse to exercise supplemental jurisdiction over state law claims if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3) (2005). "When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims . . . ." *Musson Theatrical, Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1254-55 (6th Cir. 1996); *see also Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988). We hold that the District Court did not abuse its discretion in declining to exercise supplemental jurisdiction over the state law issues based on its consideration of the interests of justice and comity best served by a state court's resolution of the remaining state law claims.

For the foregoing reasons, we affirm the decision of the District Court.