NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0458n.06

No. 24-3850

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Oct 10, 2025
KELLY L. STEPHENS, Clerk

| | | |
|---|---|---|
| AMANDA CATON; PATRICK CATON, | ) | |
| Plaintiffs-Appellees, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE |
| JACOB SALAMON; CITY OF LOVELAND, OH; | ) | SOUTHERN DISTRICT OF |
| SHAWN PARKS, | ) | OHIO |
| Defendants-Appellants. | ) | OPINION |
| | ) | |

Before: BOGGS, LARSEN, and DAVIS, Circuit Judges.

BOGGS, Circuit Judge. Plaintiffs-Appellees Amanda Caton and Patrick Caton bring federal civil-rights and state tort claims against Defendants-Appellants Jacob Salamon and Shawn Parks, as well as their employer, the City of Loveland, Ohio. In 2020, Salamon (an on-duty police officer) made a traffic stop of the Catons' car, then arrested Amanda Caton for operating a vehicle while intoxicated ("OVI"). A jury later acquitted Amanda of the OVI offense at trial.

After the Catons sued, the district court granted in part and denied in part Defendants' motion for summary judgment on qualified-immunity grounds. Defendants then appealed all claims on which the district court denied summary judgment. We affirm in part, reverse in part, and vacate in part.

**I**

In February 2020, Plaintiff-Appellees Amanda and Patrick Caton (collectively, "the Catons")[1] worked for the City of Cincinnati, Ohio, as police officers. Though the Catons worked in Cincinnati, they lived within the nearby City of Loveland, an Ohio Municipal Corporation. During the same period, Defendant-Appellants Jacob Salamon and Shawn Parks were police officers with the City of Loveland Police Department.

On the night of February 8, 2020, the Catons (who were off duty) visited several restaurants and bars in Loveland. Finishing up at around 2:00 a.m., the Catons walked back to their car and Amanda started to drive them home. In the process, the Catons caught the attention of Defendant Officer Jacob Salamon. Salamon had been on the City of Loveland's police force since 2016. During each year of his employment, Salamon had conducted the most OVI arrests of the City's approximately sixteen to twenty officers. In 2017, Salamon alone was responsible for roughly 70% of the City's OVI arrests.

After seeing the Catons' car in the early morning of February 9, 2020, Salamon began following it while recording on the cruiser's camera. The resulting footage shows Amanda largely driving without issue; however, it also captures the Catons' car veering over to touch (but not cross) the center yellow line at four different times. And at one point, the video shows that Amanda crossed fully over the center yellow line (into the oncoming lane) while making a lefthand turn. Having observed this traffic violation (*see* Ohio Rev. Code Ann. § 4511.25(A)), Salamon turned on his cruiser's lights, and performed a traffic stop of the Catons' car.

---

[1] Because Plaintiffs-Appellants share the same last name, we refer to them individually by first name only.

Approaching Amanda's driver-side window, Salamon greeted her, explained the reason for the stop, then asked for her driver's license and insurance. After determining that Amanda was carrying a firearm, Salamon received permission to secure Amanda's gun in her trunk. But when Salamon reached the trunk, he realized it was locked, and called out to the front of the car, "Pop the trunk for me, please." After a few seconds, Salamon walked back up to Caton's window, and twice requested Caton unlock the car, to no response. After a few more seconds, Salamon again asked "Can you unlock your car?" Patrick Caton finally interjected "Unlock the car, Amanda," at which point she complied. Officer Salamon placed Amanda's gun inside the trunk.

Coming back to Amanda's window, Officer Salamon told the Catons that he smelled alcohol on Amanda and that her speech was slurred. Though Patrick Caton then offered to drive the couple the rest of the way home, Officer Salamon declined, again stating that both Catons "reeked of alcohol" and that Patrick had been passed out in the passenger seat when Salamon first approached the car. Patrick denied each of Salamon's accusations and began to bicker with him, while Amanda tried to calm Patrick. At one point, Amanda can be heard to deny that she was intoxicated, stating, "That's why I drove—because I was fine."

Eventually, Officer Salamon told Amanda to get out of her car, and walked her to the front of his police cruiser. Amanda appeared to walk normally and in a straight line. Officer Salamon asked her several questions, which she answered quickly and coherently. Officer Salamon then said he was going to "check [Amanda's] eyes," to which she agreed. Amanda added, however, that she was "not going to take any kind of" other sobriety test, citing her high-heeled shoes.

At this point, City of Loveland police officer Shawn Parks arrived at the scene to provide backup to Salamon. Salamon told Parks that he was going to give Amanda the horizontal gaze nystagmus ("HGN") vision test to check her sobriety, and that "hopefully, that'll clear all this up."

-3-

He then conducted an HGN test on Amanda, but not before she told him that she had a lazy eye. Based on the apparent results of the test (which the dashcam footage fails to capture), Salamon told Amanda that he would be arresting her for "drinking and driving." Salamon read Amanda her rights, handcuffed her, and placed her in the backseat of his cruiser, as Officer Parks stood nearby. Officer Salamon and Officer Parks offered to drive Patrick Caton home, but Patrick angrily refused, opting to instead walk the rest of the way home. After parking the Catons' car nearby, the officers took Amanda to the Loveland Police Department, where she was charged with violations of Ohio Revised Code §§ 4511.19 (operating a vehicle under the influence) and 4511.25(A) (marked-lane driving violation).

Officers Salamon and Parks then drove Amanda home, stopping on the way to pick up her firearm and purse from the Catons' parked car. Outside the Catons' house, the officers walked Amanda to her driveway, then stepped onto the driveway itself. The officers then quarreled briefly with Patrick Caton, who had come outside to meet them. Officer Salamon also requested access to one of the Catons' parked vehicles in their garage, purportedly to leave Amanda's handgun in a secure place. However, the Catons declined to give Salamon permission, Amanda took her gun back from him, and the Catons went inside for the night.

Following a jury trial, Amanda was found not guilty of the OVI charge. Amanda and Patrick Caton subsequently filed suit in the Southern District of Ohio on June 14, 2022, bringing claims under 42 U.S.C. § 1983 for violation of the Fourth and Fourteenth Amendments. The Catons also asserted three Ohio state-law tort claims: false arrest/false imprisonment, malicious prosecution, and intrusion upon seclusion. Their suit named Officer Salamon, Officer Parks, Loveland Police Chief Dennis Rahe, and the City of Loveland as defendants.

The defendants moved for summary judgment, relying on qualified immunity as a defense to the § 1983 claims, and Ohio statutory immunity as a defense to the state tort claims. The district court granted in part and denied in part their motion, dismissing all § 1983 claims against Chief Rahe, but allowing some of the claims against Salamon, Parks, and the City of Loveland to proceed. With regard to the Ohio tort claims, the district court found that Chief Rahe and the City of Loveland were entitled to statutory immunity. However, the court denied Officer Salamon statutory immunity on all claims, and denied Officer Parks statutory immunity on one claim.

The defendants then filed this timely interlocutory appeal, seeking review of all claims upon which the district court denied summary judgment.

## II

### A

We review de novo a district court's denial of summary judgment. *Wiertella v. Lake County*, 141 F.4th 775, 780 (6th Cir. 2025). Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Generally, we "view the evidence in the light most favorable to the nonmovant and draw all reasonable inferences in his favor." *Raimey v. City of Niles*, 77 F.4th 441, 447 (6th Cir. 2023) (citing *Hicks v. Scott*, 958 F.3d 421, 430 (6th Cir. 2020)). But where a party's recounting of events is "blatantly contradicted" by video evidence in the record, we will not adopt that version of the facts for purposes of summary judgment. *Griffin v. Hardrick*, 604 F.3d 949, 954 (6th Cir. 2010) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

### B

Typically, denials of summary judgment are not immediately appealable, because they are not final decisions under the meaning of 28 U.S.C. § 1291. *McDonald v. Flake*, 814 F.3d 804, 812

(6th Cir. 2016). But where defendants unsuccessfully raise the defense of qualified immunity, we have jurisdiction to hear their timely interlocutory appeals under the collateral-order doctrine. *See Hall v. Navarre*, 118 F.4th 749, 754 (6th Cir. 2024) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985)). The same is true for Ohio's immunity statutes, which Defendants have raised as a defense to the Catons' state tort claims. *Chesher v. Neyer*, 477 F.3d 784, 794 (6th Cir. 2007). So we have jurisdiction to hear both the Defendants' qualified-immunity appeal, and their state statutory-immunity appeal.[2]

### III

Moving to the merits, Amanda and Patrick Caton first proceed under 42 U.S.C. § 1983, meaning they must show both: (1) a deprivation of rights secured by the Constitution and laws of the United States; and (2) that Defendants deprived them of these rights under color of state law. *Gregory v. Shelby County*, 220 F.3d 433, 441 (6th Cir. 2000); 42 U.S.C. § 1983. No party disputes that at all relevant times, Defendants were acting under color of state law.

Additionally, because Officers Salamon and Parks raise the defense of qualified immunity, the Catons bear the burden of demonstrating that the officers are not entitled to its protections. *Barton v. Martin*, 949 F.3d 938, 947 (6th Cir. 2020). Qualified immunity "protects all but the

---

[2] Plaintiffs argue that *Johnson v. Jones*, 515 U.S. 304 (1995), blocks our review of this interlocutory appeal, because Defendants continue to dispute some of Plaintiffs' version of the facts on appeal. For a time, some of our cases interpreting the Supreme Court's holding in *Jones* suggested that if a defendant disputed *any* of the plaintiff's facts while making a qualified-immunity interlocutory appeal, the appellate court would lose its jurisdiction. *See, e.g., Livermore ex rel Rohm v. Lubelan*, 476 F.3d 397, 403 (6th Cir. 2007). But we have since abandoned that approach, explaining that if, "aside from the impermissible arguments regarding disputes of fact, the defendant also raises the purely legal question of whether the facts alleged . . . support a claim of violation of clearly established law, then there is an issue over which the court has jurisdiction." *Ibid.* (alteration in original) (quoting *Estate of Carter v. City of Detroit*, 408 F.3d 305, 310 (6th Cir. 2005)).

plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (citation modified). Accordingly, the Catons must allege not only that Defendants violated their constitutional rights, but that any right was "sufficiently clear that every reasonable official would have understood that what he [was] doing violate[d] that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). That is, preexisting, binding precedent must have placed the legal question "beyond debate." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (per curiam) (citation modified).

## A

To begin, Defendants first appeal the district court's denial of qualified immunity as to Officer Salamon's prolonged traffic stop and sobriety test of Amanda Caton. The district court held that material issues of fact precluded a ruling for Officer Salamon. We affirm that portion of the district court's decision, and allow this § 1983 claim against Officer Salamon to proceed.

The Fourth Amendment, as incorporated against the states by the Fourteenth Amendment, guards against unreasonable searches and seizures. *Dunn v. Tennessee*, 697 F.2d 121, 126 (6th Cir. 1982). "Stopping a vehicle and detaining its occupants amounts to a seizure under the Fourth Amendment." *United States v. Stubblefield*, 682 F.3d 502, 505 (6th Cir. 2012) (quoting *United States v. Gross*, 550 F.3d 578, 582 (6th Cir. 2008)). So, to lawfully initiate a traffic stop, "an officer must possess either probable cause of a civil infraction or reasonable suspicion of criminal activity." *United States v. Lyons*, 687 F.3d 754, 763 (6th Cir. 2012). In ruling on the defendants' motion for summary judgment, the district court held that Salamon's initial traffic stop of the Catons was lawful, because he had probable cause to believe Amanda committed a civil traffic infraction. *See* Ohio Rev. Code Ann. § 4511.25(A). That holding is not currently on appeal.

However, even where an initial traffic stop is valid under the Fourth Amendment, an officer cannot unduly prolong that seizure. We have explained that "detaining the motorist any longer than is reasonably necessary to issue the traffic citation requires reasonable suspicion that the individual has engaged in more extensive criminal conduct." *Green v. Throckmorton*, 681 F.3d 853, 860 (6th Cir. 2012) (quoting *United States v. Smith*, 601 F.3d 530, 542 (6th Cir. 2010)). And in *Rodriguez v. United States*, 575 U.S. 348, 353–58 (2015), the Supreme Court found that prolonging an otherwise-complete traffic stop by just seven or eight minutes violated the Fourth Amendment, absent reasonable suspicion of further criminal conduct. Here, video footage in the record shows Officer Salamon prolonging the initial traffic stop by at least eight additional minutes, which was "longer than [was] reasonably necessary to issue the traffic citation[.]" *Throckmorton*, 681 F.3d at 860 (citation omitted). He therefore needed reasonable suspicion of further criminal conduct—for example, that Amanda Caton was a drunk driver—to prolong the traffic stop.

Reasonable suspicion exists when "an officer has specific and articulable facts that provide an objective basis for suspecting legal wrongdoing." *United States v. Jordan*, 100 F.4th 714, 718 (6th Cir. 2024) (citation modified). In the OVI context, we have considered factors including the time of night a traffic stop occurred, whether the suspect's breath smelled of alcohol, whether the suspect's eyes were glassy, and whether his speech was slurred. *Bradley v. Reno*, 632 F. App'x 807, 810 (6th Cir. 2015). Although reasonable suspicion is not as demanding a standard as probable cause, it is still something greater than "a mere hunch." *United States v. Campbell*, 549 F.3d 364, 370 (6th Cir. 2008).

Taking the Catons' version of the facts (supported by evidence in the record) as true, we must consider what information Officer Salamon could objectively rely upon when developing

reasonable suspicion that Amanda was drunk driving during the early morning hours of February 9, 2020. To begin, the following facts are undisputed by the Catons: Salamon encountered the Catons driving at around 2:00 a.m.; he saw their car fully cross the center yellow line once, and touch (but not cross) the yellow line four other times; and when speaking to Amanda Caton, Salamon needed to repeat his request for her to open the car's trunk several times before she finally complied.

However, at the summary-judgment stage, the Catons successfully dispute all other factors that Salamon could have relied on to develop reasonable suspicion of drunk driving. Patrick Caton testified under oath that Amanda did not smell of alcohol at the time of the traffic stop, and that her eyes were not red or glassy. He also testified that Amanda did not slur her speech while talking with Officer Salamon. And the video footage in the record does not blatantly contradict this version of events, meaning that we must credit Patrick's testimony. *See Bell v. City of Southfield*, 37 F.4th 362, 364 (6th Cir. 2022) (citing *Scott*, 550 U.S. at 380). Additionally, the video footage clearly shows that Amanda was not walking irregularly or stumbling when she left her car, and that she was able to answer each of Officer Salamon's questions.

In short, then, the Catons have alleged (relying on evidence in the record) that Salamon prolonged his traffic stop and conducted an OVI investigation of Amanda Caton based solely on the initial traffic infraction, a few other instances of minor swerving, the time of day of the stop, and Amanda's slow response in unlocking her car's trunk.

Based on these factors, a jury question remains as to whether there was reasonable suspicion of drunk driving. In *Green v. Throckmorton*, 681 F.3d 853, 861–64 (6th Cir. 2012), we considered whether several circumstances, taken together, created sufficient reasonable suspicion during a traffic stop to warrant a sobriety test. Among them was the officer's contention that the

driver's "pupils were constricted and that this feature suggested possible impairment." *Id.* at 862. The panel, however, discounted that fact because "the video provide[d] no evidence to support [the officer's] claim" and "a subsequent test for drugs and alcohol showed that the driver was in fact sober," which called into question the officer's credibility regarding the driver's pupils. *Id.* at 862-63. And questions of fact remained regarding the other alleged indicia of intoxication, including (1) the driver's confusion at the time of the stop, (2) the driver's slow reactions, and (3) the fact that the driver had committed prior traffic violations, including swerving out of her lane. The panel concluded that "a reasonable jury could find that [the plaintiff's] conduct did not create a reasonable suspicion that she was driving under the influence," and therefore that the resulting prolonged traffic stop and sobriety test were unlawful. *Id.* at 864.

Because *Throckmorton* was published in 2012, a reasonable officer in Salamon's position would have been alerted to its holding on February 9, 2020. *See Howse v. Hodous*, 953 F.3d 402, 406–7 (6th Cir. 2020). And like in *Throckmorton,* questions of fact remain surrounding the prolonging of the traffic stop. The Catons have therefore defeated summary judgment on this issue, by showing both that Amanda Caton's Fourth Amendment rights were clearly established at the time of the traffic stop, and that (taking the Catons' version of any disputed facts as true) Officer Salamon violated those rights by unlawfully prolonging a traffic stop without reasonable suspicion.

**B**

Defendants next appeal the district court's denial of qualified immunity regarding Officer Salamon and Officer Parks's arrest of Amanda Caton. The district court again held that material issues of fact precluded a ruling in favor of the officers, allowing this claim to proceed past

summary judgment. For the reasons that follow, we affirm the district court's decision as to Officer Salamon, but reverse as to Officer Parks.

**1**

Officers violate the Fourth Amendment when they arrest a suspect without either a warrant or probable cause. *See Ouza v. City of Dearborn Heights,* 969 F.3d 265, 279 (6th Cir. 2020). Officers have "probable cause to arrest an individual if the facts and circumstances within the officers' knowledge are sufficient to warrant a man of reasonable caution to believe than an offense had been . . . committed." *Hartman v. Thompson*, 931 F.3d 471, 481 (6th Cir. 2019) (citation modified). This objective inquiry considers the "totality of the circumstances" while disregarding "the arresting officer's actual [subjective] motives." *Kinlin v. Kline*, 749 F.3d 573, 579–80 (6th Cir. 2014) (citation omitted); *Ouza*, 969 F.3d at 279.

Again, we consider what information was objectively available to Officer Salamon on February 9, 2020, and whether this information would give an officer probable cause to arrest Amanda Caton. As the district court noted, these facts are largely the same as those involved in the reasonable-suspicion analysis. To reiterate, according to the Catons' testimony, Amanda did not smell of alcohol, did not slur her speech, did not have red eyes, did not admit to having been drinking, and walked steadily when asked to leave her car. Appellees' Br. at 23. Because we have already held that these facts fall short of satisfying the reasonable-suspicion standard at summary judgment, it follows that they cannot satisfy the more stringent probable-cause standard either. *See Alabama v. White*, 496 U.S. 325, 330 (1990) (explaining that reasonable suspicion is a less demanding standard than probable cause).

The only new information that Officer Salamon gained after prolonging the traffic stop but before arresting Amanda Caton was (1) Amanda's alleged failure of the HGN vision test Salamon

-11-

conducted, and (2) Amanda's refusal to take any other kind of sobriety test (purportedly because of her high-heeled shoes).

But our precedents again clearly establish that these facts, as alleged at summary judgment, are insufficient on their own to create probable cause for an OVI arrest. To begin, questions of fact remain surrounding Amanda's alleged failure of the HGN vision test. The Catons have produced an expert witness who testified that Amanda's lazy eye made her medically ineligible for the HGN vision test, and that, regardless, Salamon performed the test incorrectly; both allegations further contribute to the dispute of material fact on this issue. We have previously concluded that where questions remain regarding the validity of failed sobriety tests and there are no other indicia of intoxication, the case should be submitted to the jury. *Throckmorton*, 681 F.3d at 866–67; *see also Miller v. Sanilac County*, 606 F.3d 240, 248 (6th Cir. 2010). And Amanda's refusal to take any other test, standing alone, is also insufficient as a matter of law to create probable cause. *See Kinlin v. Kline,* 749 F.3d 573, 580 (6th Cir. 2014).[3]

In short, because the Catons have testified that Amanda lacked nearly all potential indicia of intoxication, our precedents mandate the conclusion that any remaining indicia (including the potentially flawed results of the HGN test and Amanda's refusal to submit to other tests) are insufficient to create probable cause. And in our current review of the case at summary judgment, we may not weigh the credibility of that testimony. *See Morales v. Am. Honda Motor Co.*, 71 F.3d 531, 535 (6th Cir. 1995). Accordingly, we allow this claim against Officer Salamon to proceed past summary judgment.

---

[3] In their briefing, the Catons do not cite *Kinlin v. Kline* as a case clearly establishing this principle. But even where a plaintiff fails to direct the court to relevant caselaw, the Supreme Court has advised that circuit courts may do their own review of precedent to determine if a right was clearly established at the time of a constitutional violation. *Elder v. Holloway*, 510 U.S. 510, 516 (1994) (citing *Davis v. Scherer*, 468 U.S. 183, 192 n.9 (1984)).

**2**

However, we reach a different result on the Catons' analogous claim against Officer Parks. Recall that Officer Parks did not himself conduct the HGN test, or make the decision to arrest Amanda Caton—instead, it was Officer Salamon who performed these tasks while Parks monitored Patrick Caton. Yet the district court nonetheless found Officer Parks liable for the arrest, under a theory of supervisory liability.

Typically, supervisory officials cannot be held liable under § 1983 for their subordinates' actions based simply on a theory of respondeat superior. *Taylor v. Mich. Dep't of Corr.*, 69 F.3d 76, 81 (6th Cir. 1995). Rather, plaintiffs must allege a supervising official encouraged, participated in, authorized, approved, or knowingly acquiesced to her subordinates' unconstitutional acts. *See Troutman v. Louisville Metro Dep't of Corr.*, 979 F.3d 472, 487–88 (6th Cir. 2020). Similarly, officials may face liability for their colleagues' constitutional violations if they observe those acts, have an opportunity to intervene, and fail to do so. *Fazica v. Jordan*, 926 F.3d 283, 295 (6th Cir. 2019) (citing *Floyd v. City of Detroit,* 518 F.3d 398, 406 (6th Cir. 2008)); *see also Smith v. Heath*, 691 F.2d 220, 225 (6th Cir. 1982) (explaining that an officer who was present while other officers committed a search in violation of the Fourth Amendment could also be found liable under § 1983).

Noting that neither party argues this issue at any great length, we hold that the Catons have failed to show Parks's conduct violated clearly established law. Neither the district court nor the Catons have cited any precedential authority involving supervisory liability in the drunk-driving context, nor have we been able to locate any. *See* Appellees' Br. at 20–26. Accordingly, we cannot say that an officer in Parks's position on February 9, 2020, would have known that he could incur liability in our circuit merely by arriving at the scene of an ongoing traffic stop and failing to scrutinize another officer's handling of that stop, including the administration of a sobriety test.

Indeed, such conduct seems to fall well short of the "knowing[] acquiesce[nce]" standard our caselaw requires to defeat a supervising officer's qualified-immunity defense. *Troutman*, 979 F.3d at 487-88.

Therefore, we reverse the judgment of the district court on this issue, and grant Officer Parks summary judgment on the Catons' wrongful-arrest § 1983 claim.

**C**

The Catons also brought failure-to-train claims against the City of Loveland, based on Officer Parks's and Officer Salamon's conduct during the traffic stop. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978); *Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 995 (6th Cir. 2017). The district court denied summary judgment on several of these claims. We pause our analysis of the individual claims against the officers to note that, at this interlocutory stage, we largely lack jurisdiction to review any failure-to-train claims presented by this appeal.

Our court has recently clarified that, on interlocutory appeal, we may only exercise pendent jurisdiction over a § 1983 claim alleging *Monell* liability "where the municipality's motion for summary judgment is inextricably intertwined with the qualified immunity analysis properly before the Court." *King v. City of Rockford*, 97 F.4th 379, 399 (6th Cir. 2024) (citation modified). And a *Monell* claim is only inextricably intertwined with the underlying claim if resolving the qualified-immunity question "necessarily resolves the *Monell* appeal." *Ibid*.

Applying that rule here, we lack jurisdiction to review any of the failure-to-train claims against the City of Loveland that stem from Officer Salamon's conduct. Because we hold that the Catons have sufficiently alleged that Salamon committed two different constitutional violations, "the question of municipal liability turns not simply on the actions of the individual state actors, but rather on the separate question of whether the violation may be attributed to a municipal policy

or failure to train." *Ibid.* (citation modified). And where such a situation arises on interlocutory appeal, "the court thus lacks jurisdiction over the remaining *Monell* questions." *Ibid.* We therefore leave any holdings by the district court undisturbed insofar as they relate to the City of Loveland's failure to train Officer Salamon.

However, to the limited extent that the Catons allege a failure-to-train claim regarding Officer Parks (for his participation in the arrest), that claim now fails by necessity, because we hold that Officer Parks did not violate a clearly established Fourth Amendment right. *Cf. ibid.* Accordingly, we have jurisdiction to reverse the failure-to-train claim stemming from Officer Parks's conduct, and grant summary judgment to the City of Loveland on that specific issue.

**D**

In the third and final constitutional claim implicated by this appeal, the Catons allege that Officers Salamon and Parks violated the Fourth Amendment by intruding on the curtilage of their home by stepping onto the Catons' driveway. The district court ruled for the Catons on this claim, but we reverse because the officers are entitled to judgment as a matter of law.

The Fourth Amendment not only protects individuals' homes from warrantless searches, but also the curtilage: "the area immediately surrounding and associated with the home." *Florida v. Jardines*, 569 U.S. 1, 6 (2013) (citation modified). The Catons argue that a reasonable jury could find the part of their driveway (about twenty to thirty yards from their house) that the officers entered to be curtilage.

But even assuming the driveway is part of their home's curtilage, the Catons overlook a crucial threshold issue: they have failed to allege that Officers Salamon and Parks conducted a search or a seizure there. And the Fourth Amendment to the Constitution states that the "right of the people to be secure in their persons, houses, papers, and effects, *against unreasonable searches*

*and seizures*, shall not be violated." U.S. Const. amend. IV (emphasis added). While the Catons cite cases in which officers entered a home's curtilage, each of those cases is distinguishable from their situation, because each involved officers committing a search. *See United States v. Dunn*, 480 U.S. 294, 297–98 (1987) (reviewing officials' search of defendant's suspected amphetamine laboratory); *Jardines*, 569 U.S. at 4 (reviewing detective's search of a home for drugs); *Collins v. Virginia*, 584 U.S. 586, 589 (2018) (reviewing officer's search of a motorcycle parked in a home's driveway); *United States v. Coleman*, 923 F.3d 450, 453 (6th Cir. 2019) (reviewing agent's search of a car parked in a condominium complex's driveway); *Morgan v. Fairfield County*, 903 F.3d 553, 561 (6th Cir. 2018) (reviewing officers' search of a backyard and area surrounding a house); *Daughenbaugh v. City of Tiffin*, 150 F.3d 594, 596 (6th Cir. 1998) (reviewing officers' search of a garage).

In contrast, the Catons do not allege here that Officers Salamon and Parks attempted to search or seize any property within the curtilage of their home. Instead, they argue that the officers entered the driveway "for the purpose of antagonizing and baiting Plaintiff Patrick Caton in the area immediately outside his home . . . with the intent to malign him publicly, and then proceeded to do so." Appellees' Br. at 27. The Catons' arguments are therefore like those we rejected in *Widgren v. Maple Grove Township*, 429 F.3d 575, 585 (6th Cir. 2005). The *Widgren* court explained that "the Fourth Amendment cannot be stretched to bar categorically all government breaches of the curtilage . . . . Such invasions implicate the law of trespass, but not necessarily the Fourth Amendment." *Ibid.* Although a property-tax inspector in *Widgren* entered onto the curtilage of a home to post notice of a civil infraction on the front door, the court explained that this was not a search within the meaning of the Fourth Amendment, because "[a] search generally implies looking 'over or through for the purpose of finding something.'" *Id.* at 580 (quoting *Kyllo*

*v. United States*, 533 U.S. 27, 33 n.1 (2001)); *see also United States v. Jones*, 565 U.S. 400, 408 n.5 (2012) (stating that trespass must be combined with "an attempt to find something or to obtain information" to become a Fourth Amendment search).

At most, the Catons could be understood to argue that Officer Salamon attempted to search or seize their property when he asked for permission to enter the Catons' garage to secure Amanda's gun in the trunk of one of the Catons' cars. Appellees' Br. at 29. But this argument is again foreclosed by our caselaw. Under our Fourth Amendment precedents, the "knock and talk" rule is a well-established practice that "allows an officer without a warrant to enter the curtilage and knock on the front door in an attempt to speak with the occupants or to ask for consent to search the premises." *Watson v. Pearson*, 928 F.3d 507, 512 (6th Cir. 2019); *see also United States v. Baker*, 976 F.3d 636, 642 (6th Cir. 2020). When police approach a home and ask to speak with its occupants (or even ask to enter), "they do no more than any private citizen might do." *Kentucky v. King*, 563 U.S. 452, 469 (2011). Of course, "the occupant has no obligation to open the door or to speak," nor to "allow the officers to enter the premises[.]" *Id.* at 469–70. But so long as they do not then "linger" without consent, neither have the officers committed any more of a Fourth Amendment violation than "the Nation's Girl Scouts and trick-or-treaters." *Jardines*, 569 U.S. at 8.

It is therefore ultimately immaterial whether the Catons' driveway is part of their home's curtilage. Even if it were, Officers Salamon and Parks did not commit a Fourth Amendment violation merely by stepping onto the driveway. We therefore reverse the judgment of the district court on this claim, and grant summary judgment to Officers Salamon and Parks.

**E**

Finally, we address the Catons' state tort claims against the officers. While the district court granted summary judgment for various Defendants on many of the claims, it denied summary judgment for some claims involving Officers Salamon and Parks, which are now on interlocutory appeal. *See Chesher*, 477 F.3d at 794.

Generally, the state of Ohio provides political subdivisions (like the City of Loveland, a municipal corporation) with immunity to tort liability, under Ohio Rev. Code Ann. § 2744.02(A)(1). *See* Ohio Rev. Code Ann. § 2744.01(F); *Wilston v. Stark Cnty. Dept. of Hum. Servs.*, 639 N.E.2d 105, 107 (Ohio 1994). Ohio also provides immunity to political-subdivision employees, and shields them from damages "for injury, death, or loss to person or property allegedly caused . . . in connection with a governmental or proprietary function." Ohio Rev. Code Ann. § 2744.03(A).

The Catons direct the panel to the exception found in Ohio Rev. Code § 2744.03(A)(6)(b), which denies immunity to political-subdivision employees who act "with malicious purpose, in bad faith, or in a wanton or reckless manner." "Ohio courts have defined malice as the willful and intentional design to do injury or the intention or desire to harm another, usually seriously, through conduct which is unlawful or unjustified." *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 315 n.15 (6th Cir. 2005) (internal quotation marks omitted). Bad faith "involves a dishonest purpose, conscious wrongdoing, the breach of a known duty through some ulterior motive or ill will, as in the nature of fraud, or an actual intent to mislead or deceive another." *Cook v. Cincinnati*, 658 N.E.2d 814, 821 (Ohio Ct. App. 1995).

**1**

The Catons first bring a claim for false arrest or false imprisonment. On appeal, this claim proceeds solely against Officer Salamon, and we affirm the district court's denial of summary judgment.

The torts of false arrest and false imprisonment are indistinguishable under Ohio law. *Radvansky*, 395 F.3d at 315 (citing *Rogers v. Barbera*, 164 N.E.2d 162, 164 (Ohio 1960)). The elements of the offense are "(1) the intentional detention of the person and (2) the unlawfulness of the detention." *Ibid.* (quoting *Hodges v. Meijer, Inc.*, 717 N.E.2d 806, 809 (Ohio Ct. App. 1998)). Because Amanda Caton has created a genuine dispute that Officer Salamon lacked probable cause to arrest her, *see supra* at III.B.1, and arrests without probable cause unlawfully violate the Fourth Amendment, it follows that Amanda has also created a genuine dispute of fact that her detention was unlawful.

Of course, the Catons must also overcome Ohio's statutory immunity for political-subdivision employees, by alleging that Officer Salamon acted either with malice, in bad faith, wantonly, or recklessly. But the Catons have successfully alleged that Officer Salamon acted in bad faith, because his true motive for the arrest was maintaining his position as the officer with most OVI arrests in the Loveland Police Department. Appellees' Br. at 31. As supporting evidence, the Catons allege that Salamon intentionally botched his administering of the HGN vision test (which their expert testified was improperly performed). Patrick Caton also testified that, based on his own experience as a police officer, Officer Salamon's statements about slurred speech and the smell of alcohol seemed like a performance for the dashcam, intentionally engineered to give Salamon plausible deniability for any defects in the arrest. Taking these record-supported allegations as true, Salamon's purported behavior would have been in bad faith, because

it involved a "dishonest purpose, conscious wrongdoing, or the breach of a known duty through some ulterior motive or ill will." *Cook*, 658 N.E.2d at 821.

**2**

Officer Salamon also appeals the district court's denial of summary judgment on the Catons' malicious-prosecution claim. "The elements of the tort of malicious criminal prosecution under Ohio law are (1) malice in instituting or continuing the prosecution, (2) lack of probable cause, and (3) termination of prosecution in favor of the accused." *Bickerstaff v. Lucarelli*, 830 F.3d 388, 397 (6th Cir. 2016) (citation modified). Amanda Caton undisputedly satisfies the third element of the claim—termination of the prosecution in her favor—because she was acquitted of OVI after a criminal jury trial. And again, we have also already held she satisfies the second element—lack of probable cause. *See supra* at III.B.1.

The only remaining element of a malicious prosecution claim is that Officer Salamon acted with malice. "For purposes of malicious prosecution [the term malice] means an improper purpose, or any purpose other than the legitimate interest of bringing an offender to justice." *Criss v. Springfield Township*, 564 N.E.2d 440, 443 (Ohio 1990). Additionally, under Ohio law, "the absence of probable cause to seize a person raises an inference of malice." *Wright v. City of Euclid*, 962 F.3d 852, 879 (6th Cir. 2020). As we explained in the wrongful-arrest context, the Catons have credibly alleged that Officer Salamon acted with "purpose other than the legitimate interest of bringing an offender to justice." *Criss*, 564 N.E.2d at 443. And because this alleged illegitimate purpose would also deprive Salamon of the benefit of statutory immunity, *see supra* at III.E.1, we affirm the district court's denial of summary judgment on this issue.

**3**

Finally, Officers Salamon and Parks appeal the district court's denial of summary judgment on the Catons' intrusion-upon-seclusion claim. The Catons allege that when the officers entered their driveway while dropping off Amanda Caton and began to argue with Patrick Caton, they intruded on the couple's seclusion. Ohio law recognizes several varieties of the invasion-of-privacy tort; intrusion upon the plaintiffs' seclusion, solitude, or private affairs is one such variety. *Piro v. Franklin Township*, 656 N.E.2d 1035, 1044 (Ohio Ct. App. 1995). To bring a claim, the Catons must show "the area intruded upon was private, and that the intrusion by the [officers] was unwarranted and offensive or objectionable to the reasonable man." *Contadino v. Tilow*, 589 N.E.2d 48, 53 (Ohio Ct. App. 1990); *see Dickson v. Direct Energy, LP*, 69 F.4th 338, 345 (6th Cir. 2023).

But in denying summary judgment, the district court did not discuss the applicable Ohio state statutory-immunity standard. That is, the district court did not rule on whether Officer Parks and Officer Salamon acted "with malicious purpose, in bad faith, or in a wanton or reckless manner" by stepping onto the Caton's driveway and arguing with Patrick Caton. Ohio Rev. Code Ann. § 2744.03(A)(6)(b). We therefore vacate the district court's judgment on this claim without ruling on it, so that the district court may consider in the first instance whether the Catons have met their burden at summary judgment of defeating state statutory immunity.

**IV**

In summary, we affirm the district court's ruling on the prolonged-traffic-stop claim against Officer Salamon; affirm the ruling on the drunk-driving-arrest claim against Officer Salamon; reverse the ruling on the drunk-driving-arrest claim against Officer Parks; reverse the single failure-to-train claim against the City of Loveland that stems from Officer Parks's participation in

Amanda Caton's arrest; leave undisturbed any remaining failure-to-train claims against the City; reverse the curtilage claim against both officers; affirm the state false-arrest and malicious-prosecution claims against Officer Salamon; and vacate and remand the intrusion-upon-seclusion claim against both officers.